# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN R. JACKSON, | ) 1:08cv0288 GSA |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## BACKGROUND

Plaintiff Stephen R. Jackson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his initial application in January 2005, alleging disability since July 11, 2002, due to nerve damage in his left arm, "CRSD," heart problems and depression. AR 50-52,

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On August 29, 2008, the action was reassigned to the Honorable Dennis L. Beck for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

63-72.  His application was denied initially and on appeal, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 16, 37-41, 42-46.  ALJ Howard Treblin held a hearing on January 23, 2007, and issued an order denying benefits on July 6, 2007.  AR 21-32, 935-961.  On December 26, 2007, the Appeals Council denied review.  AR 5-7.

<u>Hearing Testimony</u>

ALJ Treblin held a hearing on January 23, 2007, in Stockton, California.  Plaintiff appeared and testified with his attorney, Jorge Mastache.  AR 935.

Plaintiff testified that he was 47 years old, 5'11" and weighed about 260 pounds.  AR 938-939.  His normal weight was around 280 and he was not trying to lose weight.  AR 937.  Plaintiff was married and had a driver's license, although he only drives if he has to.  AR 939-940.  Plaintiff completed the eleventh grade.  He last worked in July 2002 in pest control, but also worked as a security guard at a casino.  AR 940-941.

He lives with his wife and two children, ages 9 and 7, in an apartment.  AR 954.

Plaintiff explained that he stopped working because he was injured on the job when he hit an air conditioning unit with his left arm.  AR 942.  Currently, he has a disease called "RSDS" in his left arm and has constant pain in that arm.  AR 942.  The pain now travels to his legs and chest.  AR 943.  He denied having any mental problems apart from "everyday life."  AR 944.  Plaintiff has an implanted spine stimulator that operates all the time.  AR 944.  If he has severe pain, he can adjust the level of electrical stimulation.  AR 946.  He was using a duragesic patch for pain but has pain all the time.  AR 946.  The pain in his left arm goes away, but not the pain in his other limbs.  AR 947.  On a bad day, he rates his pain as a 10 out of 10 and believed that he had more bad days than good days.  On a good day, he was lucky to stay at an 8.  AR 947.  Plaintiff estimated that during the day, he's on his feet for maybe a couple of hours.  AR 948.  He was off his feet at least 10 hours during the day, although he tries to walk around and do what he can.  AR 949.

Plaintiff thought he could lift or carry five pounds, but could not lift anything over his head.  He could sit for one hour before needing to get up.  AR 950.  He could stand for 10 to 15 minutes but could only walk a short distance.  He used a cane, walker and wheelchair previously,

but now makes himself walk. AR 951. He has problems holding on to things with his right hand, but not as much with his left. AR 952. Plaintiff has problems with his memory, concentration and focus, as well as problems getting along with people. AR 953. He believed that the pain patch caused some of these problems. AR 954. It also takes him a lot longer to do things. AR 956.

During the day, he usually just sits on the couch. He tries to help with the laundry, dishes, light cleaning and dusting, and do whatever he can to help around the house. AR 957.

When questioned by his attorney, Plaintiff explained that right now, the stimulator is only stimulating his left arm. His doctor also plans to use stimulators on his right arm and both legs. AR 958. When the stimulator goes off in response to pain, he is pain free for hours. His legs and his right arm, though, continue to cause pain. AR 959. His arms and legs are also becoming cold. AR 959. His right arm cramps up and he can't use it, and this happens two or three times a day, for a few minutes. AR 960.

Medical Record

Plaintiff suffered a work-related injury on July 9, 2002, when he slipped and hit the edge of his upper left arm against an air conditioning unit. AR 134. He suffered a significant contusion to at least the left radial nerve. AR 158. An EMG of his left upper extremity performed in August 2002 showed evidence of a mild median neuropathy. AR 133.

On January 20, 2003, Todd Smith. M.D., performed a surgical exploration of Plaintiff's left radial nerve. Prior to the surgery, he was assessed with a radial nerve contusion with neuropraxia in his left upper extremity and mild asymptomatic left carpal tunnel syndrome ("CTS"). AR 267-270.

Plaintiff returned to Dr. Smith on April 30, 2003, and reported that he continued to have a burning and lancinating type pain in his entire left upper extremity. AR 282. On examination, the swelling had decreased but he had pain over the entire aspect of the nerve. He also had mildly decreased sensation along the dorsoradial aspect of his left thumb and index finger. AR 282. Dr. Smith diagnosed left upper extremity radial nerve neuropraxia with neuropathic pain syndrome and recommended that Plaintiff be referred for pain management. AR 282.

On May 29, 2003, Plaintiff saw Bruce Gesson, M.D. for reflex sympathetic distrophy ("RSD") of his left arm. On examination, his left hand and arm were swollen with some cyanosis. He was "exquisitely sensitive" to touch in his right upper arm. His reflexes were somewhat depressed and he had decreased strength in his hands. Dr. Gesson believed that Plaintiff suffered from complex regional pain syndrome ("CRPS"), otherwise known as RSD. AR 261-262.

On June 27, 2003, Plaintiff underwent an epidural sympathetic nerve block. AR 276-277.

Plaintiff saw Elliot S. Krames, M.D., on September 23, 2003, for evaluation and treatment of his left arm pain. On examination, he had hypesthesia to pinprick sensation to the left arm, range of motion of the left arm joint was within normal limits, his left arm was mildly cooler than the right arm, and there was no apparent swelling. He had decreased strength in the left upper extremity. Based on his examination and review of records, Dr. Krames diagnosed Plaintiff with left upper extremity CRPS with central neuropathic pain syndrome. Plaintiff was a good candidate for a spinal cord stimulator. He also recommended that Plaintiff see a psychologist for an initial evaluation and cognitive behavior therapy. AR 384-387.

On November 20, 2003, Plaintiff saw Kirsten Meadows, M.A., for a psychological evaluation. He rated his pain at a 10 on average and a 9 at its lowest. He also reported mood swings, irritability and difficulty with memory and concentration secondary to pain. Plaintiff reported that he spends his time taking care of his two children and helping out around the house. He also reported that he was very involved in his church. On mental status examination, his judgment was adequate and there were no signs of confusion. Testing indicated that he may be "trying to emphasize how difficult his life is while claiming to be unusually psychologically resilient." He had "troublesome attitudes towards pain" and could perceive his pain as intractable. Testing further revealed that Plaintiff was socially adaptable and could relate well in a variety of social settings, although he may be guarded about reporting social conflicts. Ms. Meadows diagnosed Plaintiff with pain disorder associated with both psychological factors and a medical condition secondary to an industrial injury. She found no contraindications for him to undergo the implantation of the spinal cord stimulator. AR 403-406.

On December 11, 2003, Plaintiff underwent placement of a permanent spinal cord stimulating electrode system and neural pulse generator. AR 342-344.

On May 20, 2004, Dr. Gesson indicated that Plaintiff's CRPS/RSD had moved to his left leg. Since the placement of the stimulator, he has less pain in his left arm and has developed function back in his hands. AR 183.

On June 22, 2004, Dr. Gesson performed a left sympathetic ganglion block. AR 180.

On June 29, 2004, Plaintiff underwent a sustained lumbar sympathetic epidural block. AR 185.

Plaintiff underwent a second sustained lumbar sympathetic epidural block on July 6, 2004, after the first did not help his left leg pain. AR 190.

On March 16, 2005, Plaintiff underwent a sustained cervical epidural steroid block. AR 263.

On March 22, 2005, Kayam Haddedam, M.D., completed a questionnaire in which he opined that Plaintiff suffered from CRPS in his left upper extremity. Range of motion was normal, but Plaintiff had swelling, tenderness, hypersensitivity and tremors. Plaintiff's gait was also affected. Dr. Haddedam opined that Plaintiff had no limitations in reaching, handling or fingering and did not need an assistive device for ambulation. He noted that Plaintiff had a "successful trial" with the spinal cord stimulator and thought his prognosis was fair with the stimulator. AR 749-751.

Plaintiff saw S.K. Madireddi, M.D., for a consultive examination on April 22, 2005. On examination, he had normal range of motion in all extremities. Other than the pain reported by Plaintiff, his left upper extremity was normal, and the circumference was the same as that on the right. Grip strength was normal and Plaintiff was able to complete the intake sheet, using both hands, without trouble. His lower extremities were normal. Plaintiff had normal sensation, strength and reflexes. Dr. Madireddi found no objective signs of RSD "although certainly he says he is symptomatic." Dr. Madireddi opined that Plaintiff could sit for six hours and stand/walk for six hours, with appropriate breaks. He could lift and carry 20 pounds frequently and 25 pounds infrequently. AR 752-754.

1   On May 27, 2005, State Agency physician T. Nguyen, M.D., completed a Physical
2   Residual Functional Capacity Assessment form. Dr. Nguyen opined that Plaintiff could lift 20-
3   25 pounds occasionally, 10 pounds frequently, stand and/or walk for six hours and sit for six
4   hours. He could frequently balance and occasionally climb ramps/stairs, stoop, kneel, crouch or
5   crawl. He could never climb ropes or scaffolds. Plaintiff was limited in overhead reaching with
6   his left upper extremity. AR 755-762.

7   On May 31, 2005, Plaintiff saw Deborah von Bolschwing, a psychological assistant, for a
8   consultive mental health examination. Plaintiff reported only medical problems, although he
9   indicated that he has been taking Zoloft since 2003 "to deal with the stress of the pain." Based
10  on her mental status examination, Ms. von Bolschwing found no mental impairments. AR 763-
11  765.

12  A Psychiatric Review Technique form completed on June 29, 2005, did not indicate any
13  restrictions. AR 766-779.

14  On July 20, 2005, Plaintiff underwent an Agreed Medical Examination performed by
15  Steven D. Feinberg, M.D. On physical examination, he presented "in a most unusual fashion."
16  He walked with a bizarre gait, using a walker, and he performed unusually on strength testing.
17  Dr. Feinberg found, though, that "as best" as he could determine, Plaintiff actually had normal
18  lower body strength. His extremities showed evidence of peripheral edema. Grip strength was
19  diminished on the left. Shoulder and upper extremity range of motion was normal. There were
20  no objective signs of CRPS/RSD. Plaintiff appeared to shake and jerk on all of his movements.
21  AR 781-794.

22  Dr. Feinberg opined that Plaintiff had chronic pain syndrome and lower extremity
23  symptoms with possible etiology CRPS/RSD and/or a non-physiological basis. Based on the
24  nature of Plaintiff's presentation, Dr. Feinberg administered a Pain Assessment Battery, which
25  suggested that psychological variables may be affecting his experience of pain and treatment
26  response to a moderate degree. There was enough evidence on examination to support a finding
27  that Plaintiff's lower body spinal cord stimulator trial produced a placebo and/or psychogenic
28  effect. While Dr. Feinberg did not rule out CRPS/RSD or question Plaintiff's need for a

stimulator, he opined that Plaintiff should undergo a psychiatric evaluation before additional steps are taken. Depending on the results, Dr. Feinberg recommended that Plaintiff be seen by another pain specialist for a second opinion. AR 794-799.

Plaintiff saw Benjamin A. Carey, M.D., for a Workers' Compensation psychiatric evaluation on January 4, 2006. On mental status examination, Plaintiff was alert, oriented and his affect was mobile and appropriate, consistent with his mildly anxious mood. His thought content was significant for his complaints of pain and physical limitations. There was no evidence of psychosis or thought disorder. Cognition testing revealed multiple errors. Insight was absent and judgment was fair. Dr. Carey diagnosed conversion disorder with physical symptoms, pain disorder due to both psychological factors and a general medical condition, and compulsive personality disorder. Plaintiff's evaluation was extremely complicated because there were multiple pieces of conflicting information and cognitive limitations. Two psychological tests revealed the presence of either a conversion disorder or malingering. He recommended that Plaintiff undergo ongoing psychiatric treatment and be evaluated by a neuropsychologist to determine of he has a cognitive deficit. AR 879-907.

On March 15, 2006, Plaintiff saw Robert G. Perez, Ph.D., for a neuropsychology evaluation on February 27, 2006. Plaintiff described a significant level of cognitive impairment, and his wife confirmed these reports. On mental status examination, thought process was logical, coherent and rational, but he was very focused on various somatic complaints. Attention and concentration to testing procedures was within normal limits. Testing suggested that Plaintiff's cognitive ability falls within the low average range, although he appeared to have a significant decline in working memory. Plaintiff was quite limited in the amount of information he could process at any give time and his ability to function in situations requiring divided attention was significantly degraded. There was also a significant level of attention and concentration difficulty. There was no indication of malingering. AR 908-921.

Dr. Perez described Plaintiff as "a very puzzling situation" and he was at a loss to account for the etiology of his working memory limitations. He diagnosed cognitive impairment, not

otherwise specified.  He believed it was possible that Plaintiff's cognitive problems resulted from the affects of chronic pain and/or medications administered to deal with the pain.  AR 921-922.

On May 9, 2006, Dr. Carey issued a Supplemental Report, after reviewing the report from Dr. Perez.  Dr. Carey found that it was now apparent that Plaintiff has a cognitive impairment, etiology yet to be determined.  He recommended that Plaintiff undergo an Agreement Medical Evaluation in neurology.  AR 873-877.

On November 4, 2006, Plaintiff saw Thomas Wallace, M.D, for a Qualified Medical neurologic examination.  Plaintiff reported no pain in his left upper extremity as long as he used the stimulator, but indicated that he has constant pain in both lower extremities that increases with walking, standing or prolonged sitting.  He had difficulty providing historical details because he was "pre-occupied with a desire to have more extensive spinal cord stimulation installed."  On physical examination, Plaintiff's gait was halting and unsteady.  His upper extremities appeared normal, with no atrophy, fasciculations, edema or changes in color or temperature.  Responses to direct muscle testing were limited by the muscles tensing.  Pinprick sensibility was absent over the entire face and head, in all four limbs and over the trunk bilaterally, but light touch sensibility was intact.  Dr. Wallace indicated that the sensory response was non-physiologic.  During an EMG study of the right lower extremity, Plaintiff was unable to perform any voluntary limb movement, which Dr. Wallace described as very unusual and a non-physiological finding.  The EMG showed evidence of peripheral neuropathy in the lower extremities, although the study was incomplete.  Dr. Wallace indicated that there would be permanent disability in the left upper extremity and possibly in the lower extremities.  However, a definite physiologic basis for all but some element of pain and weakness in the lower extremities has not been demonstrated convincingly.  Medication effect was the likely cause of his cognitive problem.  AR 856-872.

Dr. Feinberg reexamined Plaintiff on December 19, 2006.  He reviewed additional medical records.  Plaintiff reported that his symptoms have increased and have spread throughout his entire body.  Plaintiff further reported that his pain is a 20-30 out of 10.  On examination, there were no objective signs of CRPS/RSD.  Dr. Feinberg diagnosed chronic pain syndrome,

lower extremity symptoms, "doubt CRPS/RSD but suspect a non-physiological basis, and significant psychiatric comorbidity." Dr. Feinberg also noted Dr. Krames' disagreement with his assessment and explained that "while a person's pain is what he says it is, the basis for invasive and expensive implanted therapy cannot be on the basis of what the patient tells you alone." Although there were underlying non-industrial issues of a physical and psychiatric nature impacting Plaintiff, he saw no convincing evidence that CRPS/RSD had spread to his lower extremities or that he should have a spinal cord stimulator. Dr. Feinberg suggested that Plaintiff be weaned from his medications to ascertain how much, if any, of his presentation is medication related. Plaintiff was "fairly dysfunctional" at this point. AR 838-855.

On March 7, 2007, Michael S. Gurvey, M.D., completed a Medical Source Statement based on Plaintiff's orthopedic abilities. He indicated that Plaintiff could frequently lift 11-20 pounds, 21-50 occasionally. He could sit for 4-6 hours at a time and stand/walk for 4-6 hours at a time. He could sit for a total of six hours and stand/walk for a total of six hours. He did not need a cane to ambulate. He could continuously use his hands and feet and could continuously perform postural activities. Dr. Gurvey opined that Plaintiff's psychological issues may be significant and could affect work-related activities. He further noted that the medical examinations do not support Plaintiff's complaints. Dr. Gurvey based his opinion on his review of Plaintiff's medical records beginning in July 2005. AR 924-934.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of "obesity without end-organ damage; history of radial nerve contusion left (non-dominant) upper extremity (with no objective clinical findings by 2005); history of mild asymptomatic CTS left (non-dominant) upper extremity in 2002 (with negative Phalen's and Tinel's signs in more recent records); and reported history of RSD/CRSD (without objective clinical signs)." AR 25.

Based on his review of the medical evidence, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a wide range of medium work. He could lift and carry 21-50 pounds occasionally, 11-20 pounds frequently, and stand, walk and sit for six hours each. He could not climb ropes or scaffolding and could occasionally climb ramps or

stairs, kneel, crouch, or crawl.  Until November 2005, he could not perform frequent overhead reaching with the left upper extremity.  AR 28.

Given this RFC, the ALJ found that Plaintiff could return to his past work as a casino slot technician and casino security guard/monitor.  Alternatively, if Plaintiff could not return to his past work, application of the Medical Vocational Guidelines would result in a finding of not disabled.  AR 31.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (obesity without end-organ damage, history of radial nerve contusion in the left upper extremity, history of mild asymptomatic CTS in the left upper extremity, and reported history of RSD/CRSD) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) can perform his past relevant work as a casino slot technician or casino security guard/monitor; or alternatively, (5) retained the RFC to perform a wide range of medium work.  AR 25-30.

Here, Plaintiff argues that the ALJ (1) failed to consider SSR 03-2p; and (2) improperly evaluated the medical opinions.

## DISCUSSION

A.   SSR 03-2p

Plaintiff first argues that the ALJ failed to consider whether his RSD/CRPS meets the diagnostic criteria set forth in SSR 03-2p.  He states, "[c]learly there is documented medical evidence identifying Plaintiff's allegation of RSD/CRPS as a medically determinable impairment."  Opening Brief, at 2.

---

[3] All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

11

First and most importantly, there is no requirement that the ALJ specifically cite SSR 03-2p. Moreover, while courts give the SSRs some deference, they do not have the force of law. *Holohan v. Massanari,* 246 F.3d 1195, 1203, n. 1 (9th Cir. 2001).

Second, the ALJ determined that Plaintiff's RSD/CRPS *was* a severe impairment. AR 25. SSR 03-2p simply describes the SSA's policy in evaluating RSD/CRPS in the context of the sequential evaluation analysis. It does not, as Plaintiff seems to suggest, mandate a finding of disability. Rather, SSR 03-2p makes it clear that if the ALJ finds RSD/CRPS to be a severe impairment, he must continue on to determine Plaintiff's RFC. Indeed, the existence of an impairment does not necessarily mean that Plaintiff will be found disabled. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of disability).

In any event, the ALJ correctly applied the sequential evaluation process in reviewing Plaintiff's RSD/CRPS. After finding that the impairment was severe, despite the fact that there were few objective signs, he found that Plaintiff's impairments limited him to medium work with additional restrictions. As SSR 03-2p states, "once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."

Accordingly, Plaintiff's argument is without merit. The ALJ's sequential evaluation of Plaintiff's RSD/CRPS was supported by substantial evidence and was free of legal error.

B. <u>Treating Physicians' Opinions</u>

In a related argument, Plaintiff contends that the ALJ erred by relying on the "reports of medical experts who evaluated" Plaintiff. Opening Brief, at 2. Plaintiff believes that the reports of treating physicians Feinberg, Carey and Wallace support his allegations of RSD/CRPS.[4]

Again, however, whether Plaintiff has RSD/CRPS is not disputed- the ALJ specifically found that Plaintiff's RSD/CRPS was a severe impairment. As the Court explained above, the

---

[4] It is unclear whether these physicians can be correctly characterized as treating sources, but their classification does not affect the Court's analysis.

1  existence of an impairment does not automatically make a claimant disabled.  Rather, once an
2  impairment is found, the ALJ must assess the limitations arising from all impairments to
3  formulate a claimant's RFC.
4       In this regard, the physicians that Plaintiff identifies do not add anything of value to the
5  RFC analysis.  For example, during Dr. Feinberg's first examination, he found no objective signs
6  of RSD/CRPS and recommended that Plaintiff undergo a psychiatric evaluation before additional
7  treatment was rendered.  AR 794-799.  During his second examination, Dr. Feinberg again found
8  no objective signs of CRPS/RSD and although he diagnosed chronic pain syndrome with lower
9  extremity symptoms, he suspected a non-physiological basis and suggested that Plaintiff be
10 weaned from his medications to ascertain how much, if any, of his presentation is medication
11 related.  AR 838-855.
12      Dr. Carey examined Plaintiff from a psychiatric standpoint and although he ultimately
13 concluded that Plaintiff had a cognitive impairment, he provided no physical or mental
14 limitations.  AR 873-877.  Finally, to the extent that Dr. Wallace indicated that there would be
15 permanent disability in the left upper extremity and possibly in the lower extremities, the ALJ
16 took these limitations into account in forming Plaintiff's RFC.
17      Indeed, based on the medical record, it appears that the ALJ gave Plaintiff the benefit of
18 the doubt by limiting him to medium work with postural limitations, including limitations on the
19 use of his left upper extremity.  AR 28.   He explained that his RFC was based "upon the totality
20 of medical opinions in the record, none of which restricted the claimant to less than at least some
21 'medium' work for 12 continuous months at any time, and especially those best supported by
22 objective medical signs and laboratory findings of a longitudinal nature."  AR 28.
23      The ALJ's finding was supported by substantial evidence and free of legal error.  The
24 medical record showed few, if any, objective signs of RSD/CRPS and, more importantly, few
25 resulting limitations.
26      To the extent Plaintiff suggests that the ALJ's reliance on Dr. Gurvey's opinion was
27 improper, his argument is also without merit.  The ALJ found more restrictions than those
28 imposed by Dr. Gurvey.  In any event, a medical expert's testimony constitutes substantial

evidence where, as here, he provides a specific rational and narrative justifying his opinion, and where the opinion is not contradicted by all other evidence. *Morgan v. Apfel*, 169 F.3d 595, 600 (9th Cir. 1999).

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Stephen R. Jackson.

IT IS SO ORDERED.

Dated:   **January 5, 2009**             /s/ **Gary S. Austin**
                                       UNITED STATES MAGISTRATE JUDGE